[No. D003359. Fourth Dist., Div. One. Dec. 11, 1985.]

ROGERS & WELLS et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
ROBERT BROXON et al., Real Parties in Interest.

COUNSEL

Munger, Tolles & Rickershauser, Dennis E. Kinnaird, Bradley S. Phillips, Mark W. Kroloff, Seltzer, Caplan, Wilkins & McMahon, Gerald L. McMahon, Elizabeth A. Smith, Whitney M. Skala, McInnis, Fitzgerald, Rees, Sharkey & McIntyre, James A. McIntyre and Virginia R. Gilson for Petitioners.

No appearance for Respondent.

Loeb & Loeb, Peter N. Scolney, Patrick R. Frega, Joel R. Wohlfeil, Cotchett & Illston, Joseph W. Cotchett, Susan Illston, Bronson, Bronson & McKinnon, Shand S. Stephens, Keesal, Young & Logan, Stephen Young, Robert D. Feighner and Shannon L. McDougald for Real Parties in Interest.

OPINION

**BUTLER, J.**—Petitioners Rogers & Wells, Norman Nouskajian, and Donald W. McVay seek a peremptory writ of mandate pursuant to Code of Civil Procedure section 877.6, subdivision (e) to review an order finding settlements in this action to have been made in good faith. We have issued an order to show cause.

Petitioners are among the defendants in several hundred lawsuits brought by defrauded investors after the collapse of J. David & Co. and related entities created by J. David Dominelli in furtherance of a fraudulent "Ponzi" scheme whereby investors were lured into investing money, based on false representations of Dominelli's superior investment track record and of supposed foreign investments, and in which early investors were paid off temporarily with later investors' funds until the structure finally collapsed. Dominelli has pleaded guilty to criminal fraud and has been sentenced and the entities are in bankruptcy. Multiple plaintiffs have sued various entities alleging fraud, negligent misrepresentation, breach of fiduciary duty, violations of California corporate securities laws, and (as to some attorney and other professional defendants) malpractice. The defendants include petitioners—attorney defendants, the law firm of Rogers & Wells; a partner, Nouskajian; and a former associate, McVay—an accounting firm and another law firm, not involved in this writ proceeding; and the settling defendants, the stock brokerage firm of Prudential-Bache Securities, Inc. (PBS), and the insurance brokerage house of Rollins Burdick Hunter of Northern California (RBH), and Ronald Massa, an executive officer of RBH. Petitioners challenge the good faith of certain settlements between PBS and RBH and some of the plaintiffs, claiming they are not reasonably proportionate to the pos-

sible liability of the settling defendants within the meaning of *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159].

The real party plaintiffs here were organized into three groups, each consisting of all plaintiffs represented by a stated law firm. As to each such group, one plaintiff was chosen as representative of the group, and the settlement agreement of that plaintiff was offered for the court's scrutiny. The groups have been referred to in this proceeding as the Beauchamp, Broxon, and Pulaski plaintiffs, respectively.

The settlement agreements submitted to the trial court, and found to be in good faith, are as follows: PBS has entered into three such agreements, one with each representative plaintiff, and RBH and Massa (hereafter collectively RBH) have settled with only one, the Beauchamp group. The terms of the PBS/Beauchamp settlement are, PBS guarantees payment of $1.2 million to plaintiffs, $150,000 to be immediately advanced; the guaranteed amount is reduced dollar for dollar by any amount recovered against any nonsettling defendant, the latter receiving no credit for the PBS settlement; so that PBS advances money, but will recover it if plaintiffs obtain at least $150,000 against the other defendants, and PBS could be liable for $1.2 million but would pay nothing if the other defendants turn out to be liable for at least that amount. The PBS settlement agreements with the Broxon and the Pulaski plaintiffs have precisely the same terms except for the amounts: they guarantee $900,000 to Broxon, advancing $112,000, and $600,000 to Pulaski, advancing $75,000. The RBH settlement, with Beauchamp only, is identical to the PBS settlement with Beauchamp—$1.2 million guarantee, advance of $150,000—except that RBH's guarantee will not be offset by recoveries against other defendants until PBS's guarantee has been reduced to zero, or in other words, plaintiffs must recover at least $1.2 million before there can be any offsets against RBH's guarantee. Together, PBS and RBH have guaranteed Beauchamp $2.4 million, with an advance of $300,000; they could end up paying nothing if plaintiffs recover at least $2.4 million against the nonsettling defendants.

The total amounts claimed by the investor plaintiffs approximate $54 million for the Beauchamp group, more than $29 million for the Broxon group, and $17 million or more for the Pulaski group.

At the time the trial court considered the settlements, PBS's demurrers had been sustained to all claims against it, with leave to amend. Further, those same claims had been filed against PBS in federal court and had been dismissed there. As to RBH, its demurrers to the causes asserted by the Beauchamp plaintiffs were sustained as to all causes of action except that

for aiding and abetting fraud. Further, at that time, the nonsettling defendants (petitioners here) had not cross-complained against either PBS or RBH.

In ruling on the settlements, the trial judge noted the nonsettling defendants had argued that in order for the settlements to be in good faith, the court would have to find the potential liability of the settling defendants was zero (because PBS and RBH could end up paying no part of the recovery). The court then recited that looking at the history of the case, the sustaining of demurrers, the fact plaintiffs had not attempted to amend their complaints against the settling defendants, and that no cross-complaints had been made against them for indemnity, as well as the judge's own impression of the theory advanced, the court did not see how a cause of action could be stated against PBS, so that "their potential liability is as close to zero as you can get." In the case of RBH, the court said there was perhaps a scintilla more of evidence of liability, but given the sustaining of demurrers and the dubious nature of the claim of investors against an insurance company which had not dealt with them, again, zero liability is a likely result. The court concluded the settlements clearly were in good faith and did not "cheat the other defendants," and approved them formally.

The allegations against PBS (as to which demurrers were sustained) premised its liability on the fact J. David Dominelli (Dominelli) had been an employee of PBS before he began his fraudulent activities; he concocted a false "track record" of successful investments allegedly occurring while he was employed at PBS and used that record later to lure investors to J. David Co. Dominelli testified he concocted his scheme while still a PBS employee, and after leaving PBS he still used a desk in the office. The manager at PBS suspected the "track record" being distributed at J. David might be misleading and wrote to Dominelli asking for an explanation. There was no allegation or evidence developed during discovery showing PBS employees played any active role in Dominelli's scheme or received any benefit from it at any time.

As to RBH, it acted as an insurance broker for J. David Co. in obtaining a "banker's blanket bond" for the entity covering losses due to criminal activity, and issued certificates showing the existence of the insurance to requesting investors, confirming that J. David Co. was insured. While RBH investigated J. David Co., no facts were alleged showing RBH discovered or knew of the fraudulent activities going on. PBS and RBH stressed the limited and peripheral nature of their role in these matters, compared with the more active and crucial part played by the defendant law firm, petitioner Rogers & Wells, which was closely associated with J. David Co. for some 18 months; had knowledge of the company's operations and control of restructuring and auditing the company at the time RBH wrote the blanket

bond; and some of whose partners allegedly knew that J. David Co. was selling securities in violation of California law and played a material role in deflecting the investigation of the California Department of Corporations.

In addition to arguing the more limited nature of the allegations against them, PBS and RBH also said their share of the actual damages, if they were liable at all, would be so small that the settlement agreements are clearly not disproportionate. RBH said it only is alleged to have had contact with some 14 of the approximately 300 Beauchamp plaintiffs, hence, its maximum arguable exposure is about $4 million out of total claims of $55 million against Rogers & Wells. PBS maintains it is simply not liable, that a cause of action has not and cannot be stated against it.

Challenging the trial court ruling, petitioners first say the court was unduly influenced by the procedural status of the pleadings. The fact plaintiffs have not sought to amend their complaints after the sustaining of demurrers signifies nothing in light of the ongoing settlement negotiations then occurring and in fact resulting in the settlement agreements under consideration. As to the Broxon plaintiffs, PBS and RBH are not even named as parties.

The absence of cross-complaints against the settling defendants is likewise insignificant since at the time of the ruling in question the Rogers & Wells' defendants had not yet answered the complaint in any of the hundreds of cases filed, and cross-complaints are customarily filed with the answer and in any case are not due to be filed until a judgment results.

Further, petitioners say sliding scale agreements such as those here, with a possible result of no liability, are always unfair because they reflect no consideration of proportionality. They say such agreements had been approved before *Tech-Bilt, supra,* by courts which disapproved settlements only when actual tortious intent toward nonsettling defendants could be shown (citing *Burlington Northern R.R. Co.* v. *Superior Court* (1982) 137 Cal.App.3d 942, 945-946 [187 Cal.Rptr. 376]; *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798 [173 Cal.Rptr. 798]; *Cardio Systems, Inc.* v. *Superior Court* (1981) 122 Cal.App.3d 880 [176 Cal.Rptr. 254]), but that *Tech-Bilt* has changed the law in that regard, requiring settlements not only to be free of corrupt intent but also to reasonably reflect the settling defendant's proportionate share of liability. Here, they contend, a reasonable estimate of the liability of PBS and RBH is large, certainly not zero, hence, the sliding scale agreements are inherently unfair because disproportionate. Although they recognize that Code of Civil Procedure section 877.5 expressly permits sliding scale agreements, they argue such agreements cannot be fair under the stated circumstances, where the agreements

can result in zero liability but a reasonable estimate of the settling defendant's liability is not zero.

As petitioners have argued, *Tech-Bilt, supra,* has changed the law regarding approval of settlements, disapproving specifically of a narrow focus on the fraudulent intent or lack thereof of the settling parties and requiring instead an assessment of the settling defendant's reasonably proportionate share of the total liability. The trial court must decide whether a "'settlement is within the reasonable range permitted by the criterion of good faith,'" (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at p. 500) and the reviewing court must consider whether the trial court has gone beyond the bounds of its broad discretion to resolve those factual issues (*id.,* at pp. 501-502; see also *Barth-Wittmore Insurance* v. *H.R. Murphy Enterprises, Inc.* (1985) 169 Cal.App.3d 124, 133 [214 Cal.Rptr. 894]). The burden is on the party challenging a settlement to demonstrate lack of good faith. (Code Civ. Proc., § 877.6, subd. (d); *Tech-Bilt, supra,* at pp. 499-500.) The relevant considerations are "a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial." (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at p. 499.) Also relevant are insurance policy limits, financial condition of parties, and the existence of collusion or tortious conduct aimed to injure nonsettling defendants. Challengers of a settlement must demonstrate "that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute." (*Id.,* at pp. 499-500.)

The California Supreme Court in *Tech-Bilt* did not specifically rule out sliding scale settlement agreements with a bottom end of zero, but it did expressly disapprove the *Burlington Northern* case, *supra,* a case which like *Dompeling* focused narrowly on the question of tortious intent, but which also involved a sliding scale settlement with a possible liability of zero, like the agreements here. Another case involving sliding scale agreements which was pending before the Supreme Court has been retransferred to the Court of Appeal (Second District) for reconsideration in light of *Tech-Bilt.* (*City of Los Angeles* v. *Superior Court* (Cal.App.), hg. granted Nov. 21, 1984, retransferred July 18, 1985.) Thus, although sliding scale agreements are authorized by statute (Code Civ. Proc., § 877.5) it is still an open question whether such an agreement is valid when the bottom end of the scale is zero and the settling defendant has potential substantial liability in the case.

Here, the trial court found the settlement not unfair or disproportionate. It was clearly influenced in its ruling not only by the procedural posture of

the case (demurrers sustained, failure to file cross-complaints) but also by its judgment that the case alleged against both settling defendants was very weak. In its judgment, PBS and RBH were entitled to "buy their peace" at the agreed-on price.

The principal issue here is whether, as one commentator expresses it, the theme of *Tech-Bilt* can be reconciled with the use of sliding scale "Mary Carter" agreements. (See Foley, *Settling Out of a Multiparty Case* (Oct. 1985) 5 Cal. Law., No. 10, pp. 25, 28.) In facing this issue we assume that despite any discouraging effect on settlement of the *Tech-Bilt* decision, that case nevertheless does not represent a repudiation of the strong public policy in California favoring settlement when possible. (See such cases as *Sears, Roebuck & Co.* v. *International Harvester Co.* (1978) 82 Cal.App.3d 492 [147 Cal.Rptr. 262]; *American Bankers Ins. Co.* v. *Avco-Lycoming Division* (1979) 97 Cal.App.3d 732 [159 Cal.Rptr. 70], both cited in dissent of Bird, C. J., in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at p. 507, n. 3.) The majority opinion in *Tech-Bilt* takes pains to point out its doubt that its approach "will be detrimental to the settlement process" (*id.* at p. 500) and says that its test of good faith leaves "substantial latitude to the parties and to the discretion of the trial court," so that "defendants will still have an incentive to get out of the litigation for a reduced amount" (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at p. 500). The court also emphasizes the broad discretion of the trial court in these matters, saying "Ordinarily, a determination as to whether a settlement is in good faith must be left to the discretion of the trial court" (*id.* at p. 502).

Further, in addition to the clear public policy favoring settlement of disputes, the Legislature has expressly recognized sliding scale agreements as valid. (Code Civ. Proc., § 877.5.)

A recent case from the Second District, *Riverside Steel Construction Co.* v. *William H. Simpson Construction Co.* (1985) 171 Cal.App.3d 781 [217 Cal.Rptr. 569], expresses the opinion that *Tech-Bilt* does not overturn all sliding scale agreements, because such agreements are legislatively recognized and the Supreme Court would have explicitly stated any intention to invalidate such arrangements. (*Id.* at p. 794.) The *Riverside Steel* opinion further says sliding scale agreements with no unconditional minimum payment may well not be "settlements" at all for purposes of applying the proportionality analysis of *Tech-Bilt*, because, as pointed out by a pre-section 877.5 case (*Pease* v. *Beech Aircraft Corp.* (1974) 38 Cal.App.3d 450 [113 Cal.Rptr. 416]), a sliding scale agreement has no immediately discernible definite value which can be offset against the judgment recovered against other defendants. (*Riverside Steel Construction Co.* v. *William H.*

*Simpson Construction Co., supra,* 171 Cal.App.3d at p. 797.) The *Riverside* court says unless a value can be ascribed to the giving of the guaranty, it is not a settlement at all; but to the extent it has present value, the relationship of that value to the proportionate liability of the defendant making the agreement may be relevant to whether the sliding scale agreement is made in good faith. (*Id.* at p. 797.) (The *Riverside* court agrees such agreements, like settlement agreements, must be determined to be good faith bargains.) (*Id.* at p. 797, fn. 7.) The court also points out that realistically speaking, most sliding scale agreements, whether or not they may result in no liability of the agreeing defendant, nevertheless do have a present value to both parties, akin to the value of an insurance agreement, otherwise neither party would enter into such agreement. (See discussion, *id.* at p. 792, fn. 5.)[1]

■■■ Here, substantial evidence supports the judgment of the trial court that the possible liability of defendants PBS and RBH is small in comparison to that of other defendants because of the more peripheral role, if any, played by the settling defendants, as contrasted with the alleged active negligence or even fraudulent misrepresentation of other defendants named. In reaching that conclusion, the trial court did not, as petitioners argue, rely narrowly on the state of the pleadings, obviously not a dispositive fact in itself, but on its perception of the weakness of the case against PBS and RBH. PBS, on the facts alleged, is but a former employer of Dominelli which at worst took no steps to prevent circulation of Dominelli's false "track record" after Dominelli had left employment. RBH is an insurance brokerage house which investigated J. David for limited purposes and was responsible for the placement of insurance and issuance of certificates showing that insurance existed. These acts and omissions form a tenuous basis at best for liability of these defendants to the investor plaintiffs.

Further, the settlement agreements here do not necessarily reflect a conclusion of zero liability on the part of PBS and RBH. They are not in the zero liability "ballpark," to use the language of *Tech-Bilt.* PBS and RBH have parted with substantial sums of money at once; the loss of the use of that money has monetary value and represents a minimum amount which PBS and RBH have paid. In addition, there is a finite probability that PBS and RBH will have to pay some part of their guarantees. The total of these guarantees is $2.4 million, not an insubstantial sum even in the 1985 economy. As the trial court found, we are not dealing here with a completely unreasonable, therefore bad faith, settlement; the agreements here are, in

---

[1] Another recent case finding a sliding scale agreement to be in good faith (of the zero bottom type) is *Abbott Ford, Inc.* v. *Superior Court* (1985) 172 Cal.App.3d 675 [218 Cal.Rptr. 605].

*Tech-Bilt* language, inside the ballpark in light of the possibility of substantial payments, the peripheral nature of the possible liability, the legislative recognition of sliding scale agreements, and the public policy generally favoring settlement. The sliding scale agreements here achieve at least partial settlement of the dispute and also guarantee a minimum recovery to plaintiffs; these factors militate in favor of their validity. (See *Sears, Roebuck & Co.* v. *International Harvester Co., supra,* 82 Cal.App.3d at p. 496; *Fisher* v. *Superior Court* (1980) 103 Cal.App.3d 434, 447 [163 Cal.Rptr. 47].)

■ Further, the opinion in *Riverside Steel, supra,* says the existence of sliding scale agreements, like the existence of settlements generally, tends to pressure other defendants into settling: thus, the court states "experienced trial judges, and particularly those who have spent a great deal of time in settlement work, know that only a small percentage of multidefendant cases ever go on through a completed trial once there has been a settlement or a sliding scale recovery agreement by one or more, but less than all, of the defendants in any given case." (*Riverside Steel Construction Co.* v. *William H. Simpson Construction Co., supra,* 171 Cal.App.3d at p. 791.) Accordingly, the statute authorizing such agreements is reasonably related to the rational goal of promoting settlement of lawsuits, and such agreements, like other settlements, are presumptively valid.

■ In analyzing the sliding scale agreement at bench in *Riverside Steel, supra,* an agreement which like those here could result in no liability of the agreeing defendant provided a minimum amount were recovered against other defendants, the *Riverside* court noted that Riverside, the appealing party, had not carried its burden of proof of invalidity of the agreement because it did not factually show that the value of the sliding scale agreement was not within the reasonable range of the agreeing defendant's liability. Similarly, here, petitioners have not shown what they believe the actual values of the agreements are, nor have they said what in their opinion constitutes a ballpark range of reasonableness within which codefendants might validly have settled the claims against them. Petitioners have taken a simplistic approach by saying that because the sliding scale agreements could result in no liability, they have no value. As we have said, and as the court said in *Riverside,* that observation is not necessarily true[2]; like other

---

[2]See the language in *Riverside Steel Construction Co.* v. *William H. Simpson Construction Co., supra,* 171 Cal.App.3d at page 792, footnote 5:

"5. Appellant equates the act of a defendant who enters into a settlement or a sliding scale recovery agreement to avoid further exposure to the necessity of paying a later sum of money with an 'escape' from 'all liability' for its acts of negligence. Not so! A settlement by a defendant simply sets a limit on a plaintiff's recovery against it by the payment of a sum of money or some other consideration. A sliding scale recovery agreement accomplishes the same thing by limiting the amount that can be recovered against that defendant in exchange for the consideration of that defendant's guaranteeing plaintiff's recovery of a certain sum of money. Sometimes that guarantee is coupled with the unconditional payment of a

guarantees, these agreements have some present value. Petitioners have not carried their burden of showing that such value is unreasonable so as to compel a conclusion of bad faith.

We find substantial evidence supports the decision of the trial court finding these settlement agreements were made in good faith. We perceive no elements of injustice to the nonsettling defendants, as existed in *Tech-Bilt*, which would compel a different result. The settling defendants having guaranteed plaintiffs a minimum recovery which is not grossly disproportionate to their probable ultimate liability, their agreements are entitled to the approval of the court. Accordingly, we discharge the order to show cause and deny the petition for writ of mandate.

Kremer, P. J., and Lewis, J., concurred.

Review was granted by the Supreme Court, March 13, 1986, and the Court of Appeal opinion was directed to remain published and citable. On May 29, 1986, the cause was dismissed as moot.

---

minimum amount of money and sometimes it is not. The giving of that consideration is no more an 'escape of all liability' than is a defendant's payment of the full amount of a judgment in exchange for a satisfaction of judgment."